IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOROTA K. MATULA,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of the U.S. Social<br>Security Administration,<br><br>Defendant. | No. 14 C 7679<br><br>Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dorota K. Matula has filed a motion seeking reversal of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") under Sections 216(i) and 223 of the Social Security Act (Pl.'s Mem.") (doc. # 16). The Commissioner filed her own motion seeking affirmance of the decision denying benefits ("Def.'s Mem.") (doc. #23). For the reasons that follow, Ms. Matula's motion is granted and the Commissioner's motion is denied.

### I.

Ms. Matula applied for benefits on December 8, 2011, alleging she became disabled on December 15, 2004, due to a left temporal arachnoid cyst with retroorbital headache, migraine headaches, and cervical degenerative disc disease (R. 80, 119-20, 131). She later amended her onset date to November 18, 2008 (R. 199). After her claim was denied initially and again upon reconsideration, Ms. Matula, represented by counsel, appeared and testified before an administrative law judge ("ALJ") on May 21, 2013 (R. 34-73). A vocational expert ("VE") and medical expert ("ME") also testified (*Id.*). The ALJ issued a written decision on June 28, 2013,

finding Ms. Matula not disabled and capable of light, unskilled work with certain limitations (R. 19-28). The Appeals Council denied Ms. Matula's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Ms. Matula's background, followed by her medical record in Part B. Part C discusses the testimony provided at the hearing before the ALJ, and Part D sets for the ALJ's written opinion.

## A.

Ms. Matula was born in Poland on January 3, 1975, and was 38 years old at the time of the hearing (R. 74). She has a high school education, and is married with two children (R. 50). Ms. Matula's past work experience includes salesperson, administrative law clerk, cost clerk, and data entry clerk, but she has not engaged in significant gainful activity ("SGA") since 2004, when she stopped working on account of a high-risk pregnancy (R. 26).

## B.

The medical record begins on December 22, 2006, when Ms. Matula was examined by a primary care physician, Andrzej Sowinski, M.D. (R. 253-54). At that visit, Ms. Matula complained of headaches with nausea, vomiting, and sensitivity to light for three to seven hours at least once per week for the past year and a half (R. 253). She reported to her doctor that occasionally Advil helped with her headaches (*Id.*). Dr. Sowinski diagnosed Ms. Matula with migraine headaches and prescribed Imitrex, a medication that treats migraines and associated symptoms (R. 254). Ms. Matula next saw Dr. Sowinski nearly 15 months later, on March 11,

2

2008, at which time he noted her complaints of sore throat, fever, and headache and prescribed antibiotics (R. 255-56).

On September 3, 2008, Ms. Matula underwent a CT scan of her brain and maxillofacial region (R. 421-22). The scans appear to have been ordered by an emergency room doctor at Alexian Brothers Medical Center (*Id.*). The brain scan showed a "[p]robable arachnoid cyst or other [cerebrospinal fluid] density adjacent to anterior tip of left temporal lobe, appearing old" (R. 421).[1] The maxillofacial scan showed "no evidence of [a] fracture, soft tissue gas or fluid collections or hematoma" (R. 422).

On October 9, 2008, Ms. Matula was examined by Afshan Hameeduddin, M.D., as a follow-up to an emergency room visit for severe headache, nausea, and vomiting (R. 216). Dr. Hameeduddin noted on that date that Ms. Matula was "much better now" (*Id.*). On October 11, 2008, Ms. Matula underwent an MRA (magnetic resonance angiogram) and MRI (magnetic resonance imaging) of the brain because of her headaches (R. 293, 423). The MRA was negative (R. 423). The MRI confirmed the presence of a moderate-sized arachnoid cyst in the anterior of the left temporal lobe, but the scan report noted that such cysts are "generally not of clinical significance" (R. 293). On October 21, 2008, Ms. Matula followed up with Dr. Hameeduddin, who reviewed the MRI and its findings, and noted that Ms. Matula reported an absence of headaches, vertigo, neck stiffness, tinnitus, and muscle or joint pain, and further noted no limitation in range of motion (R. 217).

On November 18, 2008, upon a referral by Dr. Hameeduddin, Dr. Kanu Panchal examined Ms. Matula for her ongoing headaches (R. 206-07). Dr. Panchal, a neurosurgeon,

---

[1]An arachnoid cyst is not a tumor, but instead is a fluid-filled sac that grows between the brain or spinal cord and the arachnoid membrane. https://www.cedars-sinai.edu/Patients/Health-Conditions/Arachnoid-Cysts.aspx

noted that Ms. Matula had a long history of headaches and that she had two types: occipital (which last about an hour) and frontal (which last for three to four days and sometimes include dizziness but not nausea and vomiting) (R. 206). A cervical spine x-ray revealed no abnormalities (R. 207). Dr. Panchal indicated that Ms. Matula's MRI and CT scans showed an arachnoid cyst in her left anterior temporal lobe, but opined that the cyst was not symptomatic and that Ms. Matula's headaches were unrelated to the cyst and required no specific treatment (*Id.*). Dr. Panchal concluded that Dr. Hameeduddin should refer Ms. Matula to a neurologist for medication to manage her migraines, but that from a neurosurgical viewpoint there was nothing he could recommend (*Id.*).

On April 10, 2009, Ms. Matula visited again with Dr. Hameeduddin (R. 218). She complained of left arm pain radiating throughout her back, extreme depression, and stated that she feared being alone because something might happen to her and her children (*Id.*). Dr. Hameeduddin noted that Ms. Matula was very tearful and depressed (*Id.*). He diagnosed her with major depression, single episode, with panic, anxiety, and phobia and prescribed the antidepressant Lexapro (*Id.*). Dr. Hameeduddin also recommended that Ms. Matula seek counseling (*Id.*). Ms. Matula returned to Dr. Hameeduddin on May 11, 2009 (R. 219). At that time, she reported that she was less depressed but severely nauseated in the morning and that she had continued back pain (*Id.*). Dr. Hameeduddin continued Ms. Matula's Lexapro prescription and also prescribed Midrin, a migraine medication (*Id.*). Finally, on August 10, 2009, Ms. Matula visited again with Dr. Hameeduddin, at which time she indicated that she had stopped taking her Lexapro and was getting depressed again (R. 220). She also reported continued migraine headaches and back pain (R. 220).

On September 15, 2009, Ms. Matula began treatment with a chiropractor, Jolanta Milet, D.C. (R. 222-24). Dr. Milet's medical notes indicate that Ms. Matula reported subjective complaints of cutting, throbbing, and constricting left occipital headaches that seriously affected her ability to complete activities of daily living (R. 222). She also reported neck pain radiating into her left shoulder and arm, and dull and spastic pain in her lower back (*Id.*). Dr. Milet's examination revealed that Ms. Matula had tension in her cervical and thoracic muscles bilaterally, slightly decreased range of motion in her lumbar spine, with spasms, and moderately restricted range of motion in her thoracic and cervical spine, with pain and spasms (*Id.*). Cervical ("C") spine palpation revealed moderate pain, moderate muscle spasms, and mild subluxation at C1, C2, C6, and C7, and inflammation at C7 (R. 223). Thoracic ("T") spine palpation revealed moderate pain, active trigger points, moderate muscle spasms, subluxations, and inflammation at T1 and T2 (*Id.*). Lumbosacral ("L") spine palpation revealed moderate pain, moderate muscle spasms, and mild subluxation at L4, and moderate pain, tender trigger points, subluxations and inflammation at L5 (*Id.*). Ms. Matula was placed into a relief phase of care, and future recommendations included ultrasound, home exercises, and chiropractic adjustments (R. 223-24).

Dr. Milet's records include an MRI report of Ms. Matula's cervical spine (R. 249). This report notes disc bulging at the C4-C5 and the C5-C6 disc levels (*Id.*).

Altogether, Ms. Matula visited Dr. Milet six times in September, five times in October, and four times each in November and December 2009 (R. 222-51). During these visits, Ms. Matula at times reported great improvement of her occipital headaches and neck pain, including a report on October 21, 2009, stating that she was very happy and had not had a headache in two weeks (R. 227, 230, 232, 233, 234, 235). Other times she reported a slight improvement with her

headaches and neck pain (R. 231, 240, 247), but also occasionally reported a worsening of her symptoms (R. 229, 236, 238, 239). At her last appointment on December 30, 2009, Ms. Matula rated her neck and headache pain as worse than her prior visit two weeks earlier, with pain rating a four on a scale of one to ten (R. 247).

Dr. Sowinski examined Ms. Matula on December 19, 2009 pursuant to complaints of fever, sore throat, stuffy nose, headache and general weakness (R. 257). The doctor prescribed antibiotics, cough medicine, and allergy medication (R. 258). Ms. Matula returned to Dr. Sowinski on February 24, 2010 and November 16, 2010, and on both visits reported similar complaints and again received a prescription for antibiotics, cough medicine, and allergy medication (R. 261, 264).

The medical record also contains reports from visits with medical personnel, as well as SSA reports, that took place after Ms. Matula's date last insured ("DLI") of December 31, 2010. Most notably, Ms. Matula sought the care of a different chiropractor, David Cavazos, D.C., between February and May 2011 (R. 271-92). At her first appointment in February 2011, Ms. Matula complained of having a severe headache for the past five days, pulsating neck pain, and back pain (R. 271). She reported having migraines since childhood, and complained that they occurred once or twice monthly and lasted three to five days at a time (*Id.*). She also reported that the frequency and severity of the migraines had increased over the last several years (*Id.*).

In July 2011, Ms. Matula was examined by a neurosurgeon, Douglas E. Anderson, M.D. (R. 343). Dr. Anderson noted that Ms. Matula had a history of "long term headaches, worsening over the past 2 years," and an arachnoid cyst in the left temporal lobe that he felt was best treated with "an adequate trial of medication for her headaches before proceeding with any type of surgical procedure" (*Id.*). Dr. Anderson noted that the cause of the headaches was "unclear," but

that it was possible the cyst was "irritating the [fifth cranial nerve] and either causing or exacerbating the course of the [headache]" (R. 343). He also noted that he could not be completely sure that treatment of the cyst would alleviate Ms. Matula's headaches (*Id.*). However, after a trial of pain medication that caused side effects, and given Ms. Matula's history of headaches that were non-responsive to other medications, Dr. Anderson recommended in October 2011 that Ms. Matula undergo a left temporal craniotomy to remove her arachnoid cyst (R. 464). This surgery occurred on November 21, 2011 (R. 321-22).

On January 24, 2012, state agency psychologist, David Gilliland, Psy.D., completed a Psychiatric Review Technique Form (R. 402-15). Dr. Gilliland indicated that Ms. Matula had a coexisting non-mental impairment that required referral to anther medical specialty and that there was insufficient evidence regarding the severity of Ms. Matula's mental condition before her DLI and inadequate data to assess credibility (R. 402, 414).

On January 25, 2012, Vidya Madala, M.D., completed an SSA Request for Medical Advice concerning Ms. Matula's allegations of "left temporal arachnoidal cyst with retroorbital headache and three bulging discs" (R. 416-18). Dr. Madala stated that there was insufficient evidence in the file to assess credibility or the severity of the "mental condition" prior to the DLI (R. 418). This finding was reviewed in May 2012 by Donald Cochran, Ph.D., and C.A. Gotway, M.D., who likewise found insufficient evidence in the record prior to the DLI to determine the presence of a disabling condition (R. 468-70).

## C.

A hearing before the ALJ took place on May 21, 2013 (R. 36-73). At the hearing, Ms. Matula testified that she had been struggling with headaches since childhood, although their severity had intensified over the past ten years (R. 43). Ms. Matula stated that she stopped

7

working in 2004 because of a high risk pregnancy, and that her headaches worsened after she had children (R. 43-44). Ms. Matula testified that in November 2011, she had a craniotomy to remove an arachnoid cyst (R. 46). Ms. Matula stated that a neurosurgeon said that the cyst was causing her migraine headaches, but that he could not guarantee that the headaches would subside after the craniotomy (R. 44-46). Ms. Matula stated that before the surgery she was examined by a few different doctors, all of whom told her different things as to the cause of her headaches yet offered no solutions (R. 44, 53). She stated she was confused and did not know who to listen to, and this caused her to give up and stop going to doctors for a period of time (R. 44-45, 53). Ms. Matula testified that even during that time, she suffered migraines that lasted up to one week (R. 45). She stated that she was taking over the counter medication such as Advil, ibuprofen, and Excedrin, but found little relief (*Id.*). Ms. Matula also stated that she took prescription medication, underwent chiropractic care, sought a pain specialist, and attended multiple doctors, to no avail (R. 51-52). She stated that the prescription medication caused side effects such as nausea and dizziness (R. 57). Over time, the pain became worse and the migraines lasted longer, so she started seeking professional treatment again and opted for surgery (R. 45, 53).

Ms. Matula testified that her headaches abated for a few months after the surgery but then returned, and at the time of the hearing she was having migraines four times per month (R. 46, 49). She stated that she had two different types of headaches: migraine headaches and "splice" headaches, which are weather-related (R. 47-49). She stated that her doctor prescribed injections to treat her migraines, that her husband gives her the injection, and that she needs to lie down for a few hours after each injection (R. 46-48). She also stated that she takes over-the-counter medication to help with the pain (R. 48-49).

8

Ms. Matula testified that when the migraines occur, she needs to be alone in a separate room (R. 49-50, 55). Her parents help her with her children (R. 50, 59). Ms. Matula stated that before the surgery, she could clean her house, but that after the surgery, she can only do a little at a time and needs help (R. 59). After the surgery, she did not drive for a year, although at the time of the hearing, she was able to drive short distances to the grocery store and her daughter's school (R. 51). Ms. Matula noted that she wants to work again, but fears that no one will give her personal days off for her headaches (R. 53-54). She also explained that she developed depression and anxiety after the surgery, and that she has good days and bad days (R. 55-56). She stated that she has not noticed whether lifting heavy objects brings on a headache, but that she cannot lift her daughter, who weighed 40 pounds at the time of the hearing (R. 60-61).

Medical Expert ("ME") Sheldon Slodki, M.D., testified next. He stated that as of November 18, 2008, Ms. Matula's medically determinable impairments correlated with Listings 11.05 (benign brain tumor); 1.04 (neck pain with a bulge on the MRI or CT scan of C4-5 and 5-6 with some radiating pain to the arm); 12.04 (depression, bipolar disorder); 12.06 (anxiety, panic, and obsessive compulsive disorder) (R. 40-41). Dr. Slodki noted that the "various [medical] consultants weren't absolutely sure that [Ms. Matula's] symptoms were related to the arachnoid cyst," and that its removal might not alleviate her symptoms (R. 42). Dr. Slodki also stated that he was not qualified to evaluate Ms. Matula's psychiatric disorders (R. 41) and that the record did not show "any discreet evidence of functional limitations" in regards to the other listings (R. 41-42).

Vocational Expert ("VE") Thomas Gusloff testified that Ms. Matula's past relevant work included salesperson, semi-skilled at the light physical demand level and light as performed; administrative clerk, semi-skilled at the light physical demand level and sedentary as performed;

9

cost clerk, semi-skilled at the sedentary physical level and sedentary as performed; and data-entry clerk, semi-skilled at the sedentary physical level and sedentary as performed (R. 65-66). The ALJ asked the VE a series of hypotheticals, each one assuming a hypothetical person in the younger age category, possessing a high school education, and having the same work experience as Ms. Matula (R. 66). In the first hypothetical, the ALJ asked whether a person possessing these specifications, and performing medium exertional work with certain limitations (avoidance of moderate exposure to temperature extremes; no commercial driving; no work with hazards or unprotected heights; and an environment preclusive of loud noise) would be able to perform any of Ms. Matula's past work (*Id.*). The VE responded that the individual would be capable of performing all of the past work (*Id.*).

The ALJ then asked a second hypothetical for clarification, this time placing the individual at the light exertional level, with all limitations remaining the same (R. 66-67). The VE responded that the individual would be capable of all the past work (R. 67).

The ALJ then asked a third hypothetical, placing the individual at the light exertional level, with the same limitations as presented in the first hypothetical (R. 67). The hypothetical person would have the additional limitations of working in a simple environment with only occasional decision-making requirements, and only occasional changes in the work setting (*Id.*). The VE responded that Ms. Matula's past work exceeded these limitations (*Id.*). The ALJ then asked if there was other work that such an individual could perform (*Id.*). The VE responded affirmatively, noting such jobs as photocopying-machine operator; marker for retail; and folding-machine operator (R. 67-68). The ALJ then asked the VE whether any jobs were available in more of an office-type environment versus a manufacturing environment (R. 68). For this

hypothetical (number four), the VE responded that jobs such as office helper and sales attendant were possible (R. 69).

Finally, the ALJ asked the VE a final hypothetical, based off of hypothetical number three, that questioned whether an individual who suffers migraine headaches four times per month, and who is off task one to two hours per day in addition to regularly scheduled breaks, would be employable (R. 69-70). The VE responded that headaches of that frequency would be disruptive of employment if they occurred on an ongoing basis (*Id.*). Ms. Matula's attorney then asked the VE if it would be acceptable to an employer for Ms. Matula to miss consecutive days of work (R. 71). The VE responded that an employer can generally tolerate consecutive absences on a very infrequent basis, but that if it occurred more frequently, then Ms. Matula would be unemployable (R. 70).

**D.**

On June 28, 2013, the ALJ issued a 10-page, single-spaced written opinion finding Ms. Matula not disabled pursuant to Sections 216(i) and 223(d) of the Social Security Act (R. 19-28). In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at

Steps 4 and 5 whether the claimant can return to his past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ finds the claimant to be disabled at any point in the process, she must determine whether the disability continues through the date of the decision.

At Step 1, the ALJ found that Ms. Matula did not engage in SGA during the period from her amended alleged onset date of November 18, 2008 through her DLI of December 31, 2010 (R. 21). At Step 2, the ALJ found that through the DLI, Ms. Matula had the following severe impairments: arachnoid cyst and status-post surgical removal; cervical degenerative disc disease with radiculopathy; and migraine headaches (R. 21). The ALJ also found that Ms. Matula had non-severe physical impairments, including multiple pregnancies with associated miscarriages due to cholelithiasis (R. 21-22). The ALJ also considered Ms. Matula's allegations of depression, bipolar disorder, obsessive-compulsive disorder, anxiety, and panic attacks but found there were no diagnoses for these conditions during the relevant time period and they were not durational in severity (R. 22). At Step 3, the ALJ concluded that Ms. Matula's impairments or combination of impairments did not meet or medically equal any of the criteria of any listed impairment, specifically identifying Listing 1.04 (disorders of the spine), Listings 11.02 and 11.03 (epilepsy), and Listing 11.05 (brain tumors) (R. 23). The ALJ then found that Ms. Matula has the RFC to perform light work but must avoid "moderate exposure to temperature extremes, no work with hazards, at unprotected heights, or in a loud noise work environment," and could not engage in commercial driving (R. 23). At Step 4, the ALJ found that Ms. Matula could not perform her past work (R. 26). At Step 5, the ALJ found that Ms. Matula was not disabled

because she could perform the jobs of photocopy machine operator, folding machine operator, officer helper, and sales attendant, as described by the VE at the hearing (R. 27).

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion. *Pepper*, 712 F.3d at 362. While this standard does not require an ALJ to evaluate every item of evidence in the record, it does require that she grapple with evidence that may run counter to her conclusion: cherry picking only the favorable evidence is not sufficient. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Matula contends that the ALJ committed two reversible errors. *First*, Ms. Matula argues that the ALJ's credibility assessment was legally insufficient. *Second*, Ms. Matula argues that the ALJ's RFC assessment was not supported by substantial evidence (Pl.'s Mem. at 9-16). The Commissioner counters that the ALJ reasonably assessed the extent to which Ms. Matula's symptoms limited her functional abilities, and that Ms. Matula failed to show that her restrictions exceed those determined by the ALJ (Def.'s Mem. at 3-8). For the following reasons, we agree with Plaintiff that the ALJ's credibility determination failed to fully consider the entire case record and that this error requires a remand.

## A.

Ms. Matula contends that the ALJ's credibility assessment is legally insufficient for a number of reasons, including the ALJ's failure to discuss the chiropractor's (Dr. Milet's) treatment records, and the ALJ's failure to properly weigh Ms. Matula's explanation for a gap in her treatment history before drawing a negative inference from this perceived void (Pl.'s Mem. at 9-11). The Commissioner counters that the ALJ considered numerous factors set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(v) that are relevant to the evaluation of credibility, including the medical expert's testimony that Ms. Matula was not disabled by her symptoms, and that the objective medical evidence supported the ALJ's conclusions regarding the intensity and persistence of Ms. Matula's pain (Def.'s Mem. at 7-8). The Commissioner points out that the ALJ is in the best position to determine a witness's credibility and her finding is thus entitled to great deference.

When evaluating credibility, the ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal quotations omitted). This consideration includes an evaluation of the claimant's level of pain, medication, treatment, daily activities, and limitations. *See* 20 C.F.R. § 404.1529(c). The ALJ must support the credibility finding with specific reasons that are supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). On review, this Court's role is to "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). We are required to give deference to the ALJ's credibility analysis, and we will not overturn it unless it is "patently wrong." *Skarbek v. Barnhart,* 390 F.3d 500, 504–05 (7th Cir. 2004); *see also Kittelson v. Astrue,* 362 Fed.Appx. 553, 557 (7th Cir. 2010) ("The ALJ's adverse credibility finding was not perfect.

14

But it was also not 'patently wrong'") (quoting *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000)).[2]

In this case, the ALJ pointed to objective medical evidence that the ALJ said undermined Ms. Matula's claim of severe pain. Among other things, the ALJ noted that Ms. Matula had two normal MRIs of her brain, one normal EEG, and a CT scan that revealed an arachnoid cyst believed by doctors to be unrelated to Ms. Matula's headaches (R. 25). The ALJ noted that Ms. Matula was "seen in follow-up for her headache[ ] complaints" in October 2008 where she indicated that her headaches were better, and also had a follow-up in April 2009 where she complained of left arm pain, anxiety, and depression (*Id.*).[3] The ALJ also mentioned a May 2009 visit where Ms. Matula presented as neurologically normal and reported that she was feeling "much better."[4] Moreover, the ALJ relied on the testimony of the medical expert to support her evaluation of Ms. Matula's symptoms.

We take no issue with the ALJ's discussion of this evidence: an ALJ may view discrepancies between the objective evidence and self-reports of severe pain as suggestive of symptom exaggeration. *See* SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996) (noting that a

---

[2] The SSA recently issued a Social Security Ruling ("SSR") that provides new guidance to ALJs to follow when evaluating disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). This new ruling replaces SSR 96-7p and eliminates the term "credibility" from the SSA's sub-regulatory policies, in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p at *1. Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *See Pope v. Shalala,* 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds, *Johnson v. Apfel,* 189 F.3d 561 (7th Cir. 1999). Here, the SSA specified that SSR 16-3p and its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p at *1. The Court therefore finds it appropriate to apply SSR 16-3p when analyzing Ms. Matula's challenges to the ALJ's evaluation of her complaints of pain. That being said, for the reasons set forth herein, we find that the ALJ's credibility analysis is insufficient whether we consider it pursuant to either SSR 16-3p or the superseded SSR 96-7p.

[3] Both of these appointments were with Dr. Hameeduddin, although the ALJ does not mention the doctor by name. We note that the October 2008 appointment preceded Plaintiff's claimed onset date of November 18, 2008.

[4] More accurately, Dr. Hameeduddin reported that Plaintiff was feeling "better" but that she had "severe nausea" early in the morning (R. 219).

claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Our quarrel with the ALJ is in her failure to address evidence supporting Plaintiff's claim of disabling headache pain. Notably absent from the ALJ's discussion of Ms. Matula's credibility is a discussion of the numerous reports generated by Ms. Matula's chiropractor, Dr. Milet.

In her opinion denying benefits, the ALJ referred to a "physical therapy report" in September 2009 pertaining to treatment for headaches and left shoulder, arm, and back pain (R. 25), but this description of treatment is incomplete and mischaracterizes the nature of the care rendered. Ms. Matula did not simply receive "physical therapy" in September 2009; rather, she received chiropractic care for headache and neck pain on 19 separate occasions between September and December 2009. The ALJ neither mentioned Dr. Milet by name nor referenced the extent of the care Ms. Matula received from Dr. Milet. Nor did the ALJ mention any of Ms. Matula's subjective complaints of pain, such as "cutting, throbbing, and constricting left occipital headaches" that seriously affected her ability to complete activities of daily living (R. 222). While we do not suggest that these reports require a finding of a disabling impairment, they are certainly relevant to the question of Ms. Matula's credibility as to the severity of her symptoms. The ALJ's failure to evaluate these records indicates that the ALJ did not adequately consider all of the evidence Ms. Matula put forth in support of her case. *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (noting that an ALJ must consider "all relevant evidence" and not just select certain medical reports); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (ALJ may not cherry pick evidence).

In finding that the ALJ improperly overlooked Dr. Milet's records, we are mindful that a chiropractor is not an "acceptable medical source" for purposes of Social Security disability determinations and thus cannot offer a "medical opinion." *See* 20 C.F.R. § 404.1513(a); S.S.R. 06–3p, 2006 WL 2329939 (Aug. 9, 2006). But, a chiropractor's opinion, even if not an acceptable "medical source," nevertheless is an "other source" of medical evidence that is relevant to show the severity of an impairment and how it affects one's ability to work. *See Tadros v. Astrue*, No. 10 C 7074, 2011 WL 3022302, at *10 (N.D. Ill. July 22, 2011); 20 C.F.R. § 404.1513(d)); *see also Humphries v. Apfel,* No. 99 C 1200, 2000 WL 574536, at *6 (N.D. Ill. May 10, 2000) (noting that although the regulations permit the ALJ to consider a chiropractor's opinion, the ALJ has discretion to determine the appropriate weight to be accorded to that opinion); *Cooper v. Astrue,* No. 1:06-cv-1175-JDT-TAB, 2007 WL 2904069, at *5 (S.D. Ind. Sept. 27, 2007) (holding that while the ALJ must consider the evidence of a chiropractor, he is permitted to find and give other evidence more weight). As the medical record established, and as the ALJ found, Ms. Matula suffered from the impairment of migraine headaches prior to her DLI of December 31, 2010: she was examined on November 18, 2008 by a neurosurgeon, Dr. Kanu Panchal, who noted Ms. Matula's history of occipital and frontal headaches and recommended that Ms. Matula see a neurologist for pain management (R. 206). Accordingly, the ALJ could have used Dr. Milet's treatment records from September 2009 through December 2009 to further evaluate the severity and frequency of Ms. Matula's migraine head, if any, she gave those opinions—and why. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ failed to do so here.

The absence of any explicit mention or discussion of Dr. Milet's treatment records is troublesome for an additional reason: the ALJ determined that the medical record demonstrated

a "lack of treatment" (R. 26). However, Ms. Matula's frequent visits to Dr. Milet bear on whether, and to what extent, there was a gap in treatment. Bearing in mind that the period of time at issue is only two years (November 18, 2008 to December 31, 2010), we note the following appointments within this time frame in which Ms. Matula sought assistance for her headaches and other symptoms: (1) a November 18, 2008 appointment with neurosurgeon Dr. Panchal; (2) An April 10, 2009 appointment with Dr. Hameeduddin; (3) a May 11, 2009 appointment with Dr. Hameeduddin; (4) an August 10, 2009 appointment with Dr. Hameeduddin; (5) 19 appointments with Dr. Milet between September and December 2009; (6) a December 19, 2009 appointment with Dr. Sowinski; (7) a February 24, 2010 appointment with Dr. Sowinski; and (8) a November 16, 2010 appointment with Dr. Sowkinski. While Dr. Milet is not a "medical source," Ms. Matula's visits to her are evidence that during this four month period, she experienced severe enough headache pain that she sought Dr. Milet's services on 19 occasions. Nothing in the ALJ's opinion assures us that she considered this evidence when assessing the extent to which Ms. Matula sought treatment.

Ms. Matula also argues that the ALJ impermissibly drew a negative inference from her testimony that she "gave up" on medical treatment for a period of time prior to her surgery in 2011. We agree. The ALJ stated in her opinion that she "appreciated the claimant's testimony that there was a period of time she did not seek treatment because she just gave up. But I have to look at the lack of treatment suggesting that it was not intractable pain" (R. 25-26). The ALJ was correct that a lack of treatment can suggest a lack of disabling pain; but, the ALJ erred in coming to that conclusion here without explaining why Ms. Matula's reason for "giving up" may not support a different conclusion. An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment

18

without first considering any explanations that the individual may provide." SSR 96-7p at *7; *see also Shauger*, 675 F.3d at 697; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009).

Ms. Matula stated that "she kind of gave up" and dealt with her headaches using over-the-counter medication because she went to different doctors and "everybody tell you different things, I was—didn't know who I was supposed to listen [to] so I just completely gave up and just stopped going and was dealing with the headaches for years" (R. 44-45). Ms. Matula also testified during the hearing that she had seen neurologists but that they had never prescribed her medications that worked well (R. 51). Thus, Ms. Matula explained, as best she could, that she sometimes eschewed medical treatment because she was frustrated with her doctors' conflicting advice and could not achieve pain relief. However, the ALJ interpreted this testimony as suggesting that Ms. Matula could not have been in great pain or else she would have sought more care. But the ALJ failed to say that Ms. Matula's explanation was not credible, and she did not otherwise explain why Ms. Matula's decision to suspend medical treatment led to the conclusion that the Plaintiff could not have been in great pain. *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (ALJ incorrectly found claimant's testimony not credible because she did not seek a referral to a specialist, despite claimant's testimony that she could not afford to visit a doctor frequently); *Roddy v. Astrue*, 705 F.3d 631, 638-39 (7th Cir. 2013) (although ALJ elicited testimony regarding claimant's inability to afford medical insurance, he then incorrectly based his negative credibility determination in part on the claimant's failure to seek medical treatment). The ALJ's decision may simply reflect a failure of articulation, but it equally so could reflect the drawing of an impermissible negative inference based upon Ms. Matula's gap in treatment. For this additional reason, a remand is required.

## CONCLUSION

For the reasons set forth above, the Court grants Ms. Matula's motion for summary judgment (doc. # 16) and denies the Commissioner's motion for summary affirmance (doc. # 23). This case is terminated.[5]

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: May 17, 2016**

---

[5] Given our decision above to remand this case based on the ALJ's failure to consider and discuss the records of Dr. Milet, we need not resolve the question of whether the ALJ properly determined Ms. Matula's RFC. However, on remand, the ALJ may wish to consider the extent to which Ms. Matula's cyst removal surgery in November 2011—which Dr. Panchal said in November 2008 was likely asymptomatic but that Dr. Anderson said in July 2011 may in fact be the cause of Ms. Matula's headaches—suggests either that Dr. Panchal's 2008 diagnosis was wrong, or else that the cyst became more symptomatic and may have been causing her pain prior to her DLI.